(No. 74929.—

*In re* DAVID R. JORDAN, Attorney, Respondent.

*Opinion filed November 18, 1993.*

MILLER, C.J., dissenting.

Robert J. Verrando, of Chicago, for the Administrator of the Attorney Registration and Disciplinary Commission.

Warren Lupel, of Katz, Randall & Weinberg, of Chicago, for respondent.

Peter H. Lousberg, Dennis A. Rendleman and Mary T. McDermott, of Springfield, for *amicus curiae* Illinois State Bar Association.

JUSTICE McMORROW delivered the opinion of the court:

Supreme Court Rule 772 permits an attorney to be placed on probationary status when the lawyer has committed an act of professional misconduct occasioned by a disability such as substance abuse or mental illness. (134 Ill. 2d R. 772.) In the present case, we are asked to decide whether the respondent, an attorney who suffers from no proven disability, should nevertheless receive probation for conduct that violated the Code of Profes-

sional Responsibility (107 Ill. 2d R. 1—101 *et seq.* (now replaced by the Rules of Professional Conduct, 134 Ill. 2d R. 1.1 *et seq.* (effective August 1, 1990))). Respondent suggests that probationary status is appropriate in the case at bar because his misconduct was an isolated incident in a long and otherwise untarnished legal career, did not involve moral turpitude or corrupt motives, and caused harm to no one. Respondent also notes that his legal practice is comprised of substantial *pro bono* activities and serves a predominantly underrepresented group that often cannot afford legal protection. We agree that, under the circumstances present in this case, a period of probation is an appropriate sanction for the respondent's misconduct.

## I

In 1984, Dean Pittenger (Pittenger) was injured while he was driving an automobile in Cook County. He was issued traffic citations with respect to the accident. Pittenger received medical treatment from Ingalls Memorial Hospital (Ingalls Hospital) for his injuries. Thereafter, Pittenger retained Donald Nolan, a Chicago attorney, to represent him for any personal injury award he might recover from the automobile accident.

Pittenger asked Nolan to recommend an attorney to represent him with regard to the traffic citations he had been issued for the automobile accident. Nolan suggested that Pittenger contact David R. Jordan (respondent). Respondent was admitted to the Illinois bar in 1976 and has had a sole-attorney practice in a west neighborhood of the City of Chicago since 1978. Respondent agreed to represent Pittenger with respect to the alleged traffic violations. Later respondent also agreed to represent Pittenger in filing personal bankruptcy. Pittenger did not compensate respondent at the time of this representation, because he had no funds to pay respondent. It was

respondent's expectation that he would be paid if Pittenger recovered any monetary award from the personal injury suit involving the automobile accident.

In August 1988, Nolan asked respondent about the status of a lien that had been filed by Ingalls Hospital for the costs of treatment Pittenger received following the automobile accident. Respondent told Nolan that the lien had been discharged when Pittenger had been adjudged bankrupt. A few months later, Pittenger reached a settlement with one of the defendants in the personal injury suit, in the sum of $15,000. Nolan told respondent that the attorney representing the settling defendants in the personal injury suit believed the Ingalls Hospital lien remained valid despite Pittenger's bankruptcy. Respondent telephoned Susan Bauer, who was defense counsel in the personal injury matter. Bauer told respondent that it would be necessary to obtain a release from Ingalls Hospital before Pittenger's settlement funds could be disbursed. Respondent agreed to obtain a lien release from the Hospital.

Respondent then drafted a letter to a corporate officer at Ingalls Hospital and a release of lien form. Respondent never sent the documents to the Hospital for execution, however. Respondent signed the lien release form himself, using the name of the corporate officer at Ingalls Hospital. Respondent then caused the document to be delivered to Bauer, the defense counsel in Pittenger's personal injury suit.

Bauer contacted Ingalls Hospital and discovered that the corporate officer had never signed the lien release form. When confronted with this disclosure, respondent explained to Bauer that he had sent an "employee" to the Hospital and that this employee must have been "overzealous" in obtaining the signature on the form.

Bauer advised respondent that she believed the matter should be referred to the Attorney Registration and

Disciplinary Commission (ARDC) for investigation. Respondent sent a letter to the ARDC and repeated his earlier explanation that an "employee" had been "overzealous" in forging the signature. In a later explanation to the ARDC, respondent advised that he could not divulge what had transpired because the information was subject to the "attorney-client privilege." Still later, in a sworn statement to the Administrator, respondent said that he had asked his wife to have the release signed and that she signed the document herself, without his knowledge. Thereafter, respondent's counsel advised the Administrator that respondent's sworn statements were false.

At the disciplinary hearing, respondent explained that he had executed the release of lien form "as a stupid, short-sighted and improper short-cut to get Pittenger his money quicker because he was in such desperate financial straits." Respondent characterized his actions as "foolish[ ]" and stated that he did not undertake his acts in order to receive payment from Pittenger for the legal services respondent had provided to Pittenger. Respondent also noted that Ingalls Hospital received the amount due from the proceeds of Pittenger's settlement of the personal injury suit. Respondent stated that Pittenger had not compensated respondent for his legal services.

As mitigating evidence in his own behalf, respondent testified at the hearing regarding his substantial *pro bono* activities in the neighborhood where his office is located, which is economically disadvantaged and plagued by crime. Respondent testified that he has provided *pro bono* legal services for the Austin Christian Law Center of approximately 15 hours per month. His legal representation has included domestic relations, domestic violence, guardianships, and related matters. Respondent stated that he has also assisted the Cook County Legal Assistance Foundation/Suburban Volunteer Attorneys for

approximately eight hours per month and has also provided volunteer help to the Kenwood Oakland Community Organization. Robert L. Lucas, administrator of the Kenwood Organization, testified on respondent's behalf and stated that respondent's efforts have "literally saved" a number of buildings in the north Kenwood-Oakland area. Lucas also testified that respondent has loaned the Kenwood Organization approximately $20,000 over a period of several years and that these sums were repaid shortly before the respondent's disciplinary hearing.

Following the hearing, the Hearing Board found that respondent's misconduct violated our professional ethics rules and suggested that respondent receive a three-year probation. The Review Board agreed with this recommendation. The Administrator has filed exceptions to the Review Board's recommendation and asks this court to impose a period of suspension for respondent's unethical acts.

## II

Respondent acknowledges that his signature upon the release of lien, as well as his subsequent efforts to conceal his actions, violated our professional ethics rules. (See 107 Ill. 2d R. 1—102(a)(4) (conduct involving dishonesty, deceit and misrepresentation), R. 771 (conduct tending to defeat administration of justice and bring legal profession into disrepute).) The central issue in the present case is the severity of discipline to be imposed for respondent's violations of Illinois' professional ethics rules.

Our rules set forth various forms of discipline for attorney misconduct, including disbarment, suspension, and censure. (134 Ill. 2d R. 771.) Respondent urges that suspension of his right to practice law should be stayed during a period of probation. In 1983, this court adopted

the rule that formally acknowledged its power to stay a respondent's suspension pending a term of probation. (See 94 Ill. 2d R. 772.) Rule 772 provides that probation may be imposed in conjunction with a period of suspension that is stayed while the term of probation is carried out. (134 Ill. 2d R. 772(a).) The rule states that such probation may be appropriate where the respondent lawyer has proven the following four elements:

"(1) [the attorney] can perform legal services and the continued practice of law will not cause the courts or profession to fall into disrepute;

(2) [the attorney] is unlikely to harm the public during the period of rehabilitation and the necessary conditions of probation can be adequately supervised;

(3) [the attorney] has a disability which is temporary or minor and does not require treatment and transfer to inactive status; and

(4) [the attorney] is not guilty of acts warranting disbarment." 134 Ill. 2d R. 772(a).

Respondent acknowledges that Rule 772 was intended to allow probation for an attorney whose misconduct was occasioned by a disability such as substance abuse or mental illness. Respondent also concedes that he failed to produce evidence of such disability to explain his violations of our professional ethics rules in the case at bar. Respondent contends that Rule 772 probation should be expanded to permit its imposition where no disability has been proven. Both the Review and Hearing Boards have made a similar recommendation to this court in the instant cause.

This court may, in its inherent powers, impose a probationary term for respondent's misconduct, irrespective of whether respondent's acts were occasioned by a disability envisioned by Rule 772. It is the duty and authority of this court to discipline lawyers who have engaged in unprofessional conduct; attorneys serve as officers of

the court and the court has the inherent and constitutional power to regulate the practice of law in this State. See, *e.g., In re Wyatt* (1972), 53 Ill. 2d 44, 45; *People ex rel. Illinois State Bar Association v. Peoples Stock Yards State Bank* (1931), 344 Ill. 462, 470; *In re Application of Day* (1899), 181 Ill. 73, 96-97.

Even before Rule 772 was adopted, this court recognized its inherent authority to place an errant attorney on probationary status, notwithstanding the absence of a specific rule authorizing such discipline. In *In re Driscoll* (1981), 85 Ill. 2d 312, the court imposed a six-month suspension, followed by a period of probation, for an attorney's conversion of client funds while the attorney was suffering from alcoholism. The attorney's alcoholism at the time of his ethical violations was found to be a substantial mitigating circumstance, particularly when considered in conjunction with his subsequent rehabilitation and his exemplary life before and after the incidents charged. *Driscoll*, 85 Ill. 2d at 316-17.

Following *Driscoll*, a number of this court's reported disciplinary decisions have resulted in conditional probation for the attorney's recovery from a disability that caused the lawyer's professional misconduct. In *In re Chapman* (1983), 95 Ill. 2d 484, an attorney's two-year suspension for neglect of legal matters was stayed pending probation for the lawyer's recovery from alcoholism. A similar result was reached in *In re Ackermann* (1983), 99 Ill. 2d 56, where the lawyer's six-month suspension was stayed during probation because of the attorney's rehabilitation from alcohol abuse. And in *In re Crisel* (1984), 101 Ill. 2d 332, an attorney's two-year suspension was stayed pending probation during the lawyer's treatment for depressive neurosis. More recently, in *In re Kunz* (1988), 122 Ill. 2d 547, this court imposed a two-year suspension stayed pending probation during the attorney's recovery from alcoholism. See also *In re Hogan*

(1986), 112 Ill. 2d 20 (respondent who suffered from unspecified condition causing him to be unable to draft pleadings transferred to inactive status; petition for probation under Rule 772 to be considered when respondent shows ability to practice law); *In re Hessberger* (1983), 96 Ill. 2d 423 (respondent placed on conditional probation prior to reinstatement); 134 Ill. 2d Rules 757, 758 (transfer to inactive status because of involuntary commitment, judicial determination of legal disability, mental disability, or substance addiction); see generally Carrol & Feldman, *Supreme Court Rule 772—Support for the Impaired Lawyer*, 73 Ill. B.J. 17 (1984); Skoler & Klein, *Mental Disability and Lawyer Discipline*, 12 J. Marshall L. Rev. 227 (1979); Swett, *Illinois Attorney Discipline*, 26 DePaul L. Rev. 325 (1977).

Both the public and the legal profession benefit from our use of probation as a form of attorney discipline under Rule 772. Probation allows clients to be represented by an attorney who is still capable of practicing law, albeit under certain conditions or limitations. As a result, the public benefits because it does not lose the opportunity to be served by able counsel. Moreover, probation permits the attorney to continue his legal practice; the lawyer does not forfeit all gainful employment or valuable experience in his chosen field.

Probation, by its very nature, reminds both the bar and the public that professional misconduct by attorneys will not be countenanced. By placing conditions on the respondent's term of probation, the errant attorney is constantly reminded that his actions were unethical. The requirement that the respondent account periodically to the ARDC carries a stigma that cannot be ignored or lightly brushed aside. The possibility that the term of suspension will be imposed, if the conditions of probation are not satisfied, also ensures the respondent's compliance with ethical rules. The public nature of the proceed-

ings, and our decision to impose discipline for the attorney's misconduct, send a clear message to both the respondent and the public at large that this court does not and will not tolerate or minimize attorney misconduct in this State.

Probation has thus provided significant benefits. We are hard-pressed to discern why these benefits should be limited to instances where the respondent has been found disabled by a mental illness or substance addiction. Expansion of the applicable circumstances warranting probation would serve our twin concerns in all attorney misconduct cases: to safeguard the public and protect the integrity of the bar. (See, *e.g., In re McAuliffe* (1987), 116 Ill. 2d 254, 263.) Other State courts already allow the use of probation although the attorney's misconduct was not occasioned by substance abuse or mental disability. (See, *e.g., Gadda v. State Bar* (1990), 50 Cal. 3d 344, 787 P.2d 95, 267 Cal. Rptr. 114; *Florida Bar v. Guard* (Fla. 1984), 448 So. 2d 981; *Florida Bar v. Brennan* (Fla. 1982), 411 So. 2d 176; *In re McCallum* (Minn. 1980), 289 N.W.2d 146; *In re Schiff* (Mo. 1976), 542 S.W.2d 771 (*en banc*); *In re Kotok* (1987), 108 N.J. 314, 528 A.2d 1307; *In re Privette* (1978), 92 N.M. 32, 582 P.2d 804; *In re Haws* (1990), 310 Or. 741, 801 P.2d 818; *State Board of Law Examiners v. Holland* (Wyo. 1972), 494 P.2d 196.) Our ultimate objective in attorney discipline is not to be harsh or to punish the respondent, but to impose a sanction that is uniquely tailored to the precise facts of each particular case. (See, *e.g., In re Owens* (1991), 144 Ill. 2d 372, 380 (*per curiam*).) To this end we must retain a degree of flexibility in disciplining unprofessional conduct, so that we are guided by the spirit of our rules, not merely by a strict or technical interpretation of terminology.

In our view, a term of probation, where the attorney's right to practice law is limited by certain conditions or requirements, "should be imposed when a lawyer's right to practice law needs to be monitored or limited rather than suspended or revoked." (Model Standards for Imposing Lawyer Sanctions, Standard 2.7, Commentary, at 15 (1992).) We conclude that the instant cause, given its precise facts and circumstances, is one where the respondent's right to practice should be monitored rather than revoked.

We emphasize that the respondent's signature on the release of lien form, combined with his efforts to conceal his actions by blaming others for the incident, clearly violated our professional ethics rules for attorneys. (107 Ill. 2d Rules 771, 1—102.) Although no pecuniary harm was caused by the respondent's conduct, we cannot ignore the equally significant nonpecuniary damage to the legal profession that resulted from respondent's actions. (See *In re Lamberis* (1982), 93 Ill. 2d 222 (respondent censured for plagiarism in master's thesis).) Respondent's efforts to conceal his conduct cast a particularly poor reflection on his ability to handle client matters wisely. Respondent's misconduct warrants disciplinary sanction.

Nevertheless, we do not believe that suspension of respondent's law license would be appropriate under the facts of the instant cause. Respondent was not motivated by personal gain or profit. Respondent unsuccessfully attempted an improper "short-cut" to facilitate his client's speedy receipt of monies from settlement of the personal injury claim. As the respondent himself later conceded, the attempt was a "stupid" error in judgment.

In addition, respondent's unprofessional actions were an isolated incident. Respondent has led an exemplary career that, with the exception of the instant

proceedings, has seen no proof of professional misconduct. Respondent's community activities and *pro bono* legal work are considerable. The Administrator acknowledges that respondent's law practice serves a primarily poor and underrepresented segment of the community, and that respondent's legal services have often gone unpaid or underpaid.

We believe that a period of probation will adequately protect the public and the reputation of the legal profession. Weighing all of the surrounding circumstances, we conclude that respondent should receive a three-year suspension, stayed by a three-year period of probation. The following terms of probation, as recommended by the Hearing Board and the Review Board, are also imposed:

(1) respondent shall devote a minimum of 25 hours per month without charge to the various organizations he has assisted;

(2) respondent shall itemize the time devoted on such *pro bono* legal matters, with quarterly reports to the Administrator;

(3) respondent shall attend an appropriate course of instruction on the Illinois Rules of Professional Conduct, to be determined in consultation with the Administrator and subject to the approval of the Administrator, in the first year of probation;

(4) respondent shall reimburse the Administrator for the costs of this proceeding as defined in Supreme Court Rule 773 and will reimburse the Commission for any further costs incurred during probation.

If the respondent either (1) fails to comply with the terms of this probation, (2) becomes subject to any further discipline, or (3) is found guilty of a felony or mis-

demeanor, this period of probation shall cease and the term of suspension shall be reinstated.

The suggestions of *amicus curiae* Illinois State Bar Association, regarding the formal modification of the specific terms of Rule 772 to provide for probation where the respondent attorney suffers from no disability, are hereby taken under advisement for further study and review.

*Suspension ordered but stayed; conditional probation entered.*

CHIEF JUSTICE MILLER, dissenting:

I do not agree with the majority's conclusion that probation is the appropriate sanction in the present case. The respondent forged a signature on a document and later attempted to conceal his misconduct through an elaborate series of lies. On this record, I believe that a suspension, not stayed by a term of probation, is necessary.

As the majority opinion notes, Rule 772 currently limits the availability of probation as a sanction in disciplinary matters to cases in which the attorney has a temporary or minor disability. (134 Ill. 2d R. 772; see *In re Trezise* (1987), 118 Ill. 2d 346, 354-55; *In re Goldstein* (1984), 103 Ill. 2d 123, 131.) In the present case, the majority broadens the scope of the rule considerably, allowing imposition of probation here and, by extension, in other cases in which no disability is claimed.

Even if it is assumed that probation should be made available in a wider range of circumstances, I do not agree with the majority's conclusion that probation is appropriate in this case. The facts of the respondent's misconduct are not in dispute. The respondent forged a hospital officer's signature on a release-of-lien form in November 1988. When opposing counsel questioned the

authenticity of the signature, the respondent stated that he had sent an unnamed employee to the hospital with the form and that the employee must have been "overzealous" in attempting to procure the necessary signature. Perhaps hoping to forestall a formal inquiry into the matter, the respondent then wrote to the Attorney Registration and Disciplinary Commission, advising the Commission of the forgery but attributing it to either a mix-up at the hospital or, again, to the actions of the anonymous employee. Later, in January 1989, in response to an inquiry from the Commission, the respondent refused to disclose the identity of the particular employee, declaring that information about the incident had been revealed to him in a privileged conversation. Finally, in a sworn statement made in March 1989, the respondent provided an explanation that was different from his earlier accounts, casting blame for the forgery on his wife.

There is some dispute regarding the respondent's motive for his initial misconduct in forging the hospital officer's signature on the release-of-lien form. Before the Hearing Board, the respondent acknowledged that he had hoped that he would receive, from the settlement proceeds, the $2,460 fee owed to him by this client. Yet the Hearing Board found that there was "no clear and convincing evidence that the misdeed was done to deprive [the hospital] of any money, or to benefit the Respondent economically." It is clear, though, that the respondent's forgery of the hospital officer's signature, as well as his subsequent actions in attempting to cover up that initial misdeed, constituted conduct involving dishonesty, deceit, and misrepresentation, as both the Hearing Board and the Review Board concluded.

However desirable probation might be as a sanction in attorney disciplinary cases, I do not believe that it is

an appropriate disposition in the case at bar. The history of *pro bono* activities undertaken by the respondent is commendable, as is his decision to practice in the community he has served. Though these are mitigating matters (see *In re Merriwether* (1990), 138 Ill. 2d 191, 201-02), I do not believe that they warrant the disposition chosen by the majority in this case. As we have often stated, the attorney disciplinary process is intended to safeguard the public, to maintain the integrity of the legal profession, and to protect the administration of justice from reproach. (*In re Witt* (1991), 145 Ill. 2d 380, 397-98; *In re Kitsos* (1989), 127 Ill. 2d 1, 10; *In re Teichner* (1984), 104 Ill. 2d 150, 160.) None of these goals are advanced by the sanction imposed here. There is nothing in this case to suggest that the respondent's actions in forging the hospital officer's signature and in attempting later to shift the blame to others would be remediable by a course of probation under the conditions imposed by the majority, or under any other conditions that might be proposed. Nor do I believe that the respondent, his past and future clients, or the public at large is well-served by a disciplinary sanction that now allows the respondent to carry on his law practice without interruption, simply on the condition that he continue performing, during the period of probation, the same public service work the majority relies on as mitigation in determining its disposition. There is no sanction at all in that remedy.

It is no answer here to conclude, as the majority seemingly does, that the respondent's decision to work in a distressed area means that a lower standard of conduct should govern his professional life, or qualifies him for a less onerous sanction in the event of misconduct. Such a result is unfair to the clients involved and can only threaten to undermine the moral authority of our legal system. The requirements of the rules of pro-

fessional conduct apply to all lawyers and to all cases equally; the ethical demands of the legal profession are not somehow reduced when the potential fee is small or the particular client is poor. (See *In re Samuels* (1989), 126 Ill. 2d 509, 530 ("We also find troublesome the implication in respondent's remarks that there is some cut-rate version of our rules which permits an attorney to agree to represent a client in a matter and then 'move on' when the case fails to meet his or her expectation").) I would hope that no one is so cynical as to suggest that the residents of an impoverished community must be made to bear the burden of an unethical attorney merely because they are too poor to pay for better representation.

The misconduct disclosed in the present case is serious. The respondent forged the hospital officer's signature on the release-of-lien form and later compounded that initial dishonesty with an elaborate series of lies, including an attempt to shift the blame for his misconduct to his wife. Misconduct of this nature strikes at the core of a lawyer's ethical duties and is not of a type that can be remedied through a course of probation. In its zeal to expand the range of circumstances in which probation is an available sanction, the majority has overlooked these fundamental principles and has chosen the wrong case in which to apply a broadened rule.